104

# CIRCUIT COURT OF BALTIMORE CITY

Filed April 5, 1890.

ELIZABETH B. C. BRUCE ET AL.
VS.
WILLIAM SCHWARZ ET AL.

*Fisher, Bruce & Fisher* for plaintiffs.

*George R. Willis, John and David Stewart, T. M. Lanahan and Frank Gosnell* for the defendants.

WRIGHT, J.—

The bill in this case alleges that a certain contract was entered into between the plaintiffs and defendants in or about the month of June, 1889, by which all the parties agreed that the building line on Calvert street on the fronts of their several lots should be set back eighteen feet from the curb line, with the privilege, however, of erecting bay-windows beyond said eighteen-foot line. This contract, it is averred, was a parol contract, but that it was agreed that it should be reduced to writing, "and that said agreement, when so reduced to writing, should be signed, sealed, acknowledged and delivered, duly attested by the parties thereto, so that the same might be recorded." "That when said agreement was entered into, it was intended to be the full and final expression of the assent of said parties to its stipulations, and that it was simply for the purpose of perpetuating these stipulations in a lasting form that it was further agreed as aforesaid, that said stipulations should be reduced to writing." The bill further alleges that the plaintiff, Mrs. Bruce, relying upon said agreement, proceeded to erect her house "the main front wall of said dwelling house in purposed conformity with the provisions of said agreement being placed even one foot and ten inches further west from the west curb line," than was required by the terms of said agreement. That after heavy expenses had been incurred by said plaintiff, she was informed that the defendant, Hooper, declined to sign the terms of the agreement, and that the defendant, Schwarz, had refused to comply with the terms thereof, but on the contrary had commenced the erection of his dwelling house with its main front wall projecting eastwardly beyond the line fixed by the agreement. The bill then prays for an injunction against Schwarz, restraining him from violating the agreement, and commanding him to take down his structure, so far as erected in violation of the same, and that all the defendants may be required to execute and acknowledge said agreement, when reduced to writing, so that the same may be recorded. The prayer for general relief follows. The defendants, Schwarz and Hooper, in their answer deny all the material allegations of the bill so far as they relate to said parol agreement. The written agreement drawn up to express the terms of the alleged parol agreement, is filed with the testimony returned as "Plaintiff's Exhibit Examiner agreement." This paper begins as follows: "This agreement made this —— day of ————, 1889, by and between Theodore Hooper and ——— Hooper, his wife, of the first part; David Stewart, &c., of the second part; William Schwarz, &c., of the third part, and Edward B. Bruce, &c., of the fourth part," and recites that "whereas the said parties of the first, second, third and fourth parts heretofore have agreed with one another to preserve and maintain a uniform space between the curb line on the west side of Calvert street and the improvements to be erected upon their several lots of ground for the purposes of a sidewalk,

&c." Then follow the terms of the agreement as alleged in the bill. It is admitted in argument by the plaintiff's counsel that the alleged agreement is of that character required by the fourth section of the Statute of Frauds, to be in writing, but it is contended that there has been such a part performance of the parol agreement as removes it from the operation of the statute. In the examination of this case it is necessary to inquire what must be shown by the plaintiffs, before they will be entitled to the relief asked by them; and, first, in regard to the formation of contract. As admitted by counsel for the plaintiffs, the formation and the terms of the parol contract must be clearly made out. Have then, the formation and the terms of the parol contract been made out in that clear and positive manner in which the authorities declare they must be made out? Has there, in fact, been proven in this case that any certain contract has been entered into, as alleged in the bill, between the parties? I do not think it is possible to successfully contend (nor do I understand it to be contended) that any of the parties to this alleged parol agreement can be held bound by the same, unless all can be so held.

The very object of the agreement, being to preserve and maintain uniformity in the width of the pavement for a certain distance, cannot be attained unless each of the several owners of the property within the required limits shall be held bound by the terms of that agreement. The bill itself, and the unexecuted paper drawn up "for the purpose of perpetuating" the stipulations of said alleged contract, show this distinctly. In regard to all cases like the present, "where the party claims to take the case out of the Statute of Frauds, on the ground of part performance of the contract he must make out, by clear and satisfactory proof, the existence of the contract as laid in the bill." (Chesapeake and Ohio Canal Co. vs. Young, 3 Md. 490; Semmes vs. Worthington, 38 Md. 318.) It was earnestly contended by the plaintiffs' counsel that the strong language used by the Court in the several cases cited by the defendants in regard to the character or sufficiency of the proof in these cases must be considered in connection with the facts in the cases cited; but I think that the

long list of cases in which substantially the same language is used, show that Courts have established it as a rule, applicable to all such cases, that the proof of the existence of the contract must be clear and satisfactory. I am convinced that this has been the established rule in this country, at least, ever since the case of Phillips vs. Thompson (1 Johns. Ch. R., 131) decided by Chancellor Kent in 1814, and approved by our Court of Appeals in the 3 Md. case above cited. Many cases might be cited to justify this statement.

The rule requires something more than a mere preponderance of proof. It requires—if we are to give any effect to the meaning of the words used —proof free from anything that creates reasonable doubt and uncertainty in the mind. It means "that amount of proof which ordinarily satisfies an unprejudiced mind beyond reasonable doubt. I Greenl. Ev., Sec. 2. In the first place then, has it been shown by clear and satisfactory proof that all the parties, claimed to be bound by the alleged parol contract, did in fact bind themselves by such contract in such a manner as to be estopped from denying the same under the state of facts shown in these proceedings? I do not think that it will be necessary to go farther than to inquire as to whether Theodore Hooper, one of the defendants, did so bind himself.

Mr. Bruce, one of the plaintiffs, (and the one who acted for his wife in this whole transaction) in his testimony details his understanding of what the agreement was, and the circumstances that led him to believe that such an agreement existed as justified him on the faith of it, to proceed to build his house on the line, which he understood was prescribed by that agreement, on the supposition that the other parties were bound to observe the same line. The second question in chief propounded to Mr. Bruce is as follows: "Please state with whom said agreement was made and what was the agreement?" He answers: "When I bought the property from Mr. Gorter he informed me that other parties who had bought, and were thinking of buying or about consummating, would all agree to go back to a line eighteen feet from the curb, and not to come out from that eighteen feet with any projection" greater than

three feet. "Mr. Schwarz, the defendant, told me he would agree to that. I personally had no talk with Mr. Hooper." He further testifies that he did afterwards have a conversation with Hooper, and further on in his testimony it is shown that the conversation he had with Hooper was in the fall, and was sometime after Hooper had refused to sign and denied that he had even made any such agreement. In this conversation Bruce says that Hooper stated to him that he would sign "that paper" after his house was up. Now, I think it would be unreasonable to hold from the language used by the witness, Mr. Bruce himself, when directly asked to state what the agreement was, that any certain contract had been entered into. This language, without at present considering other portions of the testimony, would seem to indicate that the uncertain parties who might purchase, would at some future time enter into an agreement, the terms of which were to be expressed in some more formal manner than was done by the indefinite language used by Mr. Gorter. In the next question Mr. Bruce is asked "Whether there was any verbal agreement before the execution of the paper, and if there was, what it was, and with whom made." He answers, "There was a verbal agreement, and it was made through Mr. Gorter, representing others and Mr. Schwarz himself." It will be noticed here that the witness does not detail the circumstances that occurred, but simply says that there was a verbal agreement. It is hardly necessary to say that the witness is not the proper one to decide whether or not an agreement was made. It was for him to state all the facts that occurred in such a manner that the Court would be enabled to say whether a valid contract had or had not been entered into. In answer to the forty-second question, the same witness says that he would not have built his house on the line he did, had he known that Schwarz would decline to place his house by it, and that the line of eighteen feet was verbally established and agreed upon, as he understood it, without any promise, and that a paper was to be drawn up and signed by all, and recorded to that effect. And in the eleventh question he is asked, "Did you place the house where it is by reason of and on the faith of the agreement, which you

have spoken of, between yourself and Mr. Schwarz," to which he answers, "I did; that and Mr. Gorter—," the question was objected to as leading and was liable to that objection; but other portions of the testimony show that there had been a mistake on the part of some one in locating Bruce's front wall and that, in consequence of that mistake, it was placed some distance back of the eighteen-foot line, where he would have had a right to have placed it under the agreement, if said agreement was a binding one. This, to say the least, seems to show that there was a considerable degree of uncertainty as to what the terms of the agreement really were on the part of Mr. Bruce, or his builder, Mr. Blake, or of Mr. Gorter, who, it appears, gave the line to the builder. There certainly seems to be a variance between Mr. Gorter's and Mr. Blake's testimony as to who was responsible for the mistake, but as Mr. Blake did take the responsibility of acting on Mr. Gorter's statement of the location of the line, it is only reasonable to believe that it was the latter's error. Mr. Bruce does afterwards in his testimony say, that the exhibit agreement contains the verbal agreement. I cannot find that there is anything in Bruce's testimony that directly connects Hooper with the alleged agreement. He relied entirely in that respect on Mr. Gorter, and if Hooper can be held at all he must be held by the testimony of Gorter and by his own conduct. It must clearly be shown that Hooper authorized Gorter to act as his agent to bind him by the alleged verbal agreement, and that Gorter, acting as such agent, did so bind him. This brings us to Mr. Gorter's testimony. By the fourth question in chief Gorter is asked to state fully what was done, after the purchase of Mrs. Bruce, with reference to any further changes with respect to the location of the front of the houses, &c. He answers, "after selling to Mr. Hooper a fifty-foot lot on southwest corner of Biddle and Calvert streets, Mr. Hooper suggested my seeing every one interested on that side, to see if they would not go back three feet more with the main body of their houses, allowing bay-window projections to come out three feet. I saw every one, Mr. Bruce, Mr. Schwarz and Mr. Stewart, who was interested with me in the property; they expressed

their willingness to sign a paper to that effect." On cross-examination (2 Cross 2) he is asked to tell, as near as he could, when it was that Mr. Hooper spoke to him about the three-foot line on the west side of the street, and to state exactly what Hooper said to him and what he said to Hooper. He answers, "I can't remember the dates of the conversations," (it seems that he had had other conversations with Hooper with regard to establishing a different line on both sides of the street) "and it would be very hard," he continues, "to give the exact conversations, but my impression was that Mr. Hooper was perfectly willing and anxious that every one should agree to set back."

Now, it will be observed that the witness in answer to the fourth question in chief, when asked to state fully all his knowledge of what was done after the purchase by Mrs. Bruce, with respect to the location of the front of said houses, instead of giving any facts or conversations with Hooper, by which the Court would be justified in holding that he had by Hooper been constituted his agent to bind him by the alleged contract, he merely says (so far as Hooper is concerned) that it was suggested by Mr. Hooper that he should see the parties, to see if they would not agree to a certain building line. And again when he has a full opportunity presented by the second cross-question by explaining the exact relation between Hooper and himself, and to show clearly the relation of principal and agent, if it existed, he fails to do so, but only gives his impression as to the state of Mr. Hooper's mind in regard to the proposed line. Can it be fairly concluded that there is the slightest evidence in this testimony that Hooper intended to constitute Gorter, his agent, to enter into a solemn and binding agreement that would affect his property for all time? Was it not rather a mere suggestion of Hooper, made only for the purpose of inquiring, and with a just and reasonable expectation that the result of the inquiry should be reported to him for his further action, should he still be "willing and anxious" to establish the suggested line? Does Gorter even report the result of his inquiries to Hooper? When asked in the fourth cross-question, if Hooper saw him after the first interview on the subject to make inquiries as to how he had progressed, he answers, "I do not remember his seeing me and inquiring about the agreement;" and I cannot resist the inference from the language used by the witness to the fourth question in chief, following that above quoted from that answer, that he never saw Hooper again on the subject until he learned that Hooper has refused to sign the proposed written agreement. There are indeed expressions used by the witness, Gorter, that would seem to indicate that the parties had all agreed to sign, such as his answer to the tenth cross-question, where he says: "All had been seen and all had agreed to sign it." But this language can hardly be extended to mean that there was another interview with Hooper on the subject, when taken in connection with the language previously used, but it would appear to be only an inference of the witness from his "impression" that Hooper was "willing and anxious that every one should agree to the set back." At all events, the witness has given no other interview on the subject, and I am not at liberty to enter into this field of conjecture. I have no doubt that the plaintiff, Mr. Bruce, acted under the belief, or took it for granted that there had been a binding agreement entered into between the parties, but the testimony of the witness does not, I think, justify me in coming to that conclusion. I cannot find anything, even in the testimony of the plaintiffs' witnesses, that would lead me to hold that Gorter had any authority whatever to bind Hooper by the alleged verbal agreement.

But, in addition to this, it must be borne in mind that the defendant, Hooper, most positively denies that he ever authorized either Gorter or any one else to enter into the alleged agreement. In regard to the conduct of Hooper and his acts in placing the front wall on the eighteen-foot line, I will only say that I fully agree with the plaintiffs' counsel that the conduct of parties is frequently stronger evidence than the oral testimony of witnesses, and I should not hesitate to apply this principle if I thought that the facts justified such an application. If the defendant, Hooper, in locating his line could not be considered as acting on any other reasonable hypothesis than the existence of the alleged verbal contract, I should not hesitate to say

that such action removed all doubt from my mind on the subject. But where an unimpeached witness swears most positively that he did not act on the belief of the existence of a certain state of facts, but that his action resulted from other and different facts known to him, and his action in that regard being equally reasonable, I must give full weight to his testimony.

This I consider to be the position of affairs in regard to the actions of Mr. Hooper; whether he acted on the belief that the eighteen-foot line was established, or on his knowledge of the McKim fifteen-foot line, under the belief in regard to his "swell front" being a part of his main front wall as shown in the testimony, is a fact within his own knowledge. He himself has most positively stated that he acted with reference to the McKim line, and being an unimpeached witness, I am bound to take his testimony as true, as it seems to me to be reconcilable with the facts. There were many other questions raised in the argument, but as I do think the evidence does not clearly and satisfactorily establish the formation of the alleged contract, it is unnecessary. The plaintiffs may have a remedy against some one, in consequence of the error into which they have been led, but I am very clearly of the opinion that the facts presented do not entitle them to the relief of specific performance. The bill must therefore be dismissed.