HENRY D. ZIMMERMAN ET UX. *v.* GORMAN FRANKLIN SUMMERS ET UX.

[No. 75, September Term, 1974.]

*Decided January 10, 1975.*

The cause was argued before ORTH, C. J., and POWERS and GILBERT, JJ.

*Reginald D. Malloy* for appellants.

*Orrin J. Brown* for appellees.

POWERS, J., delivered the opinion of the Court.

This case illustrates the serious consequences of careless or uninformed dealing with rights in real estate. For many years Henry D. Zimmerman and Mollie Naomi Zimmerman, his wife, had been crossing a small area in the corner of their neighbor's property in going to and from their own. Both properties are located in Howard County, near Ellicott City. In May, 1971, Gorman Franklin Summers and Ruth Ann

Summers, his wife, present owners of the adjoining property, filed a bill of complaint in the Circuit Court for Howard County, seeking to enjoin what they alleged to be a continuing trespass. The Zimmermans denied that they were trespassers, and claimed that their use of the Summers property was a matter of right.

The court, T. Hunt Mayfield, judge, entered a decree restraining and enjoining the Zimmermans from trespassing on the property of the Summerses. The Zimmermans appealed from that decree.

## A. The Facts

Each of the two parcels contains between one and one half and two acres. They lie side by side. The front lines of the two parcels appear to form one continuous line. This front line abuts other private property, and is more than 250 feet away from what was formerly known as Old Jonestown Road, relocated some years ago as Rogers Avenue. Ingress and egress for each of the two parcels has been over a private roadway, 14 feet wide, which begins at the front line of the Summers parcel, where it corners with the Zimmerman parcel, and runs out to the public road. An easement over this 14 foot roadway is shown by the land records to be appurtenant to the Summers parcel. There was no evidence one way or the other to show any recorded right over the roadway appurtenant to the Zimmerman parcel, but that use is not an issue here. The record indicates some doubt whether that private roadway continues across the space between the old public road and the present Rogers Avenue, but that question is not involved in this case. What is clear beyond doubt is that the private roadway comes to a dead end against the Summers parcel only. It shares a common corner, but no common line, with Zimmerman. With respect to that 14 foot private roadway and the Zimmerman parcel, their contiguity might be described as one of infinite minuteness.

The Zimmermans acquired title to their property in 1954 by a deed from Mrs. Zimmerman's mother. The grantor then

owned a tract of slightly more than seven acres, some of which fronted on the public road. The Zimmermans obtained a building permit in 1954, and over a period of about three years, they built the house in which they still live. They testified that they began some preparatory activity on the parcel as early as 1949, and that from the beginning, they crossed the corner of the adjoining parcel to gain access.

A Mr. Richards testified that he acquired what is now the Summers parcel by deed from his mother in 1953. There was an old house on it which he remodeled. It had belonged to his grandmother, and he had known the property all of his life. He was familiar with the private roadway from the front line of his property to the public road. He knew, also, that a 12 foot strip along the side of the property, an extension of the 14 foot private roadway, was subject to an easement for access to property to the rear, but was no longer used and was overgrown.

Mr. Richards testified that the first work on the Zimmerman property was begun in 1954, and that until that time, the property was grown up as high as the telephone wires with honeysuckle. He said that he and some friends hunted rabbits on it. He said that Mrs. Zimmerman called him on the telephone in the spring of 1954, and asked his permission to use his driveway to bring in building materials. He gave the permission, and they started using his driveway during the summer of 1954. Their work continued into 1956. Mr. Richards said that about a month after the telephone call, he received a legal document to sign about the right of way. After he showed the paper to a lawyer, he informed the Zimmermans that he would not sign it — that they would have to go out through her mother's property. Mr. Richards said that he and the Zimmermans got along pretty well living there together, but that in 1955 or 1956, and a number of times after that, he told one or both of them, in a congenial way, that they should arrange for another way to go in and out. He said also that for a couple of years, around 1958 or 1959, the Zimmermans operated a store at Woodlawn and lived in that area. There was other evidence that they never moved out of

the house at Ellicott City and continued to occupy it on a part time basis before coming back full time.

The Richards property was conveyed to Mr. and Mrs. Summers in 1969. They were related to the Richards family, and knew the property before they bought it. Mrs. Summers testified that she asked the Zimmermans if they were going to stop using the driveway, and go out another way. Their response was that Mr. Richards always meant to give it to them, and that they would continue to use it.

The area of the Summers land which the Zimmermans would be required to use to continue the same means of ingress and egress to their property is small. A triangle formed by two lines about 12 feet long across the front and down the side from the corner of the Summers parcel, with a base joining those two lines, would be sufficient. The area would appear to be roughly 72 square feet. The Zimmermans claim a legal right to continue to use it.

The chancellor, in an opinion filed on 27 November 1973, held that they had no right, and were trespassers. The opinion was followed by a decree filed on 4 December 1973. The decree itself contained no findings. Aside from its formal parts, the decree provided that the Zimmermans "be, and they are hereby, restrained and enjoined from trespassing on the property" of the Summerses.

In this appeal from the decree against them the Zimmermans alternatively contend:

1. That they acquired an easement by prescription across the corner of appellees' property by adverse use for a period of twenty years.

2. That the appellees are equitably estopped from enjoining the use because their predecessor gave the appellants a license to cross the property when they were constructing their house.

The chancellor's opinion clearly explained the factual background of the case, and the contentions of the parties. Its significant conclusory parts are:

"This Court finds no legal right in the

Respondents to the use of any part of the Complainants' land.

\* \* \*

"The Respondents' contention is that they have acquired title to the use of the twelve foot strip by their use thereof, and the use of their predecessors in title, for a period in excess of twenty years. The Court does not find such a right to have been established.

\* \* \*

"It is the opinion of this Court that the Complainants have clearly shown a continuing trespass by the Respondents on to the property of the Complainants, and that the Respondents should be enjoined from continuing such trespass."

### B. The Law Of Easements By Prescription

Several basic legal principles, as well as a few peripheral ones, are involved in the contention of the appellants that they acquired an easement by prescription across the property of the appellees by continued adverse use for a period of twenty years.

### 1. In General

One of the leading cases in Maryland defining the requirements of an easement by prescription is *Cox v. Forrest*, 60 Md. 74 (1883). In that case the plaintiffs sought to recover damages for obstruction of a private right of way which they claimed to have acquired over the defendant's land. The Court of Appeals said, at 79-80:

"In the absence of an express grant, it was necessary for the plaintiffs to prove an adverse, exclusive, and uninterrupted enjoyment of the right of way in question for twenty years.

"By *adverse* is meant a *user*, without license or permission, for an adverse right of an easement cannot grow out of a mere permissive enjoyment, the real point of distinction being between a permissive or tolerated user, and one which is claimed as a matter of right. Where one, however, has used a right of way for twenty years unexplained, it is but fair to presume the user is under a claim of right, unless it appears to have been by permission. In other words, the use of a way over the lands of another whenever one sees fit, and without asking leave, is an *adverse* use, and the burden is upon the owner of the land, to show that the use of the way was by license or contract inconsistent with a claim of right. *Bachelder v. Wakefield*, 8 Cush. 243; *Hall v. McLeod*, 2 Met. (Ky.) 98; *Garrett v. Jackson*, 20 Pa. St. 331; *Tickle v. Brown*, 4 Ad. & El. 369; *School District, Etc. v. Lynch*, 33 Conn. 334; *Hammond v. Zehner*, 23 Barb. 473.

"By *exclusive*, the law does not mean that the right of way must be used by one person only, because two or more persons may be entitled to the use of the same way, but simply that the right should not depend for its enjoyment upon a similar right in others, and that the party claiming it exercises it under some claim existing in his favor, independent of all others. It must be *exclusive* as against the right of the community at large.

"Nor does the law mean by 'an uninterrupted and continuous enjoyment,' that a person shall use the way every day for twenty years, but simply that he exercises the right more or less frequently, according to the nature of the use to which its enjoyment may be applied, and without objection on the part of the owner of the land, and under such circumstances as excludes the presumption of a voluntary abandonment on the part of the person claiming it."

The Court of Appeals held to the same effect in *Condry v. Laurie*, 184 Md. 317, 41 A. 2d 66 (1945), where it said, at 321:

"In order to establish an easement by prescription, it is necessary to prove an adverse, exclusive and uninterrupted use of the way for twenty years. Adverse use means use without license or permission. Where a person has used a right of way for twenty years unexplained, it is fair to presume that the use has been under a claim of right, unless it appears to have been by permission. *Cox v. Forrest*, 60 Md. 74, 79; *Smith v. Shiebeck*, 180 Md. 412, 24 A. 2d 795."

See also *Dalton v. Real Estate & Improvement Co.*, 201 Md. 34, 92 A. 2d 585 (1952).

## 2. The Meaning of Exclusive

It should be noted that the requirement that the use be exclusive means that it is the claim of right rather than the use itself which must be exclusive. This distinction was expressed in *Wilson v. Waters*, 192 Md. 221, 64 A. 2d 135 (1949), where the Court said, at 226:

"It is well established that to acquire an easement by prescription, the claimant must prove adverse, exclusive and continuous use for twenty years. *Waters v. Snouffer*, 88 Md. 391, 41 A. 785; *Smith v. Shiebeck*, 180 Md. 412, 419, 24 A. 2d 795; *Condry v. Laurie*, 184 Md. 317, 41 A. 2d 66; *Punte v. Taylor*, 189 Md. 102, 111, 53 A. 2d 773, 777. We recognize, however, that while adverse possession, sufficient to establish title in fee simple, must be absolutely exclusive, the user essential for establishing an easement is exclusive in the limited sense that the claimant's right must not depend for its enjoyment upon a similar right in others, and, though claimant may not have been the only one who used it, he used it under a claim of right independently of all others. *Cox v. Forrest*, 60 Md. 74, 80; 4 *Tiffany, Real Property*, 3d Ed., sec. 1199."

### 3. Interruption of Use or Intermittent Use

One of the contentions argued on behalf of the Summerses is that there was a period of one to two years, in 1958 and 1959, when the Zimmermans moved away from the property, and that their being away interrupted whatever continuous use they claimed. Relevent to this contention there was evidence by the Zimmermans, which was not disputed, that they did not move their possessions out of the home, and although they lived away from it the better part of the time during that period, they occupied it on weekends and frequently at other times during the week.

The requirement that adverse use be continuous does not mean that the user must be exercised constantly and without any intermission. The requirement may be satisfied by use "with such frequency and constancy as to affect the landowner with notice that it is being exercised", 4 Tiffany, *The Law of Real Property*, § 1202 (3d ed. B. Jones 1939). In Stuart v. Johnson, 181 Md. 145, 28 A. 2d 837 (1942), the owner of the dominant tenement had lived on it while she was growing up and, during that period, had used the roadway on the servient tenement without interference from its owner. The house in which she lived was destroyed by fire and she moved away. A few years later, she purchased the property, restored the house, and resumed the use of the roadway. The Court of Appeals held that the exercise of the user was sufficiently continuous to sustain the claimant's burden of proving that she had acquired title by prescription to the right of way.

In *Clayton v. Jensen*, 240 Md. 337, 214 A. 2d 154 (1965), the Court of Appeals said, at 344-45:

> "Daily use of the right of way is not required, but only that use normally resulting from the nature of the use itself. It is only required that a cessation of use not indicate a voluntary abandonment of the use by the person claiming it. *Cox v. Forrest, supra.* Indeed we have held that the absence of the person seeking to establish the easement from the dominant tenement for 'a few

years' during which time the right of way was not used by that person, who, however, resumed the use upon her return, did not prevent the use from being continuous or indicate an abandonment of the use."

4. Continuity of Use Before Ownership or Use By Predecessor

Another contention advanced on behalf of the Summerses is that the Zimmermans did not acquire title to the dominant tenement until 1954 and could not claim use of the servient tenement prior to that time. Again there was contradicted evidence relating to the period prior to 1954. The Zimmermans said that they commenced the use of the driveway on the adjoining property in 1949 when they reached the agreement with Mrs. Zimmerman's mother to buy the property. On the other hand, it was at least implied by the testimony of Mr. Richards that there was no use by the Zimmermans of the driveway on the property which he acquired in 1953 until the early part of 1954. While the resolution of disputed facts was for the judge, the law is as expressed in *Clayton v. Jensen, supra,* at 345:

"It is clear that the possession taken prior to the deed under the contract of sale may be tacked to the possession after the delivery of the deed to establish the necessary period of adverse possession to perfect title in the contract vendee. See 2 C.J.S. *Adverse Possession,* § 130 (b), page 688 (1936) where it is stated:

'Nevertheless, a vendee who had possession under an executory contract and subsequently acquired a deed may tack his possession before to his possession after the receipt of his deed to perfect title in himself.' "

See also *Stuart v. Johnson, supra,* where the adverse use began before the owner of the dominant tenement acquired title to it and while she was living on the property during her childhood and young womanhood.

A slightly different aspect of this principle was expressed in *Gore v. Hall*, 206 Md. 485, 112 A. 2d 675 (1955), where the Court said, at 491:

> "* * * where there is privity of estate between the successive parties in possession, the possession of such parties may be tacked so as to make the twenty years required by the Statute of Limitations. The law is clear that such privity may be created by a sale and conveyance and possession under it as well as by descent."

Tacking the adverse use by a predecessor owner of the dominant tenement in privity with the subsequent owner was also recognized in *Zehner v. Fink*, 19 Md. App. 338, 347, 311 A. 2d 477 (1973).

### 5. Permissive Use Is Not Adverse

Use of the land of another by permission of or license from the owner is not adverse and, no matter how long it is continued, cannot ripen into an easement by prescription. In *Condry v. Laurie, supra*, the Court of Appeals said, at 320-21:

> "The distinction between an easement and a mere license to use land is clear. While an easement implies an interest in land, a license is merely a personal privilege to do some particular act or series of acts on land without possessing any estate or interest therein. *Shipley v. Fink*, 102 Md. 219, 226, 62 A. 360; *McClintic-Marshall Co. v. Ford Motor Co.*, 254 Mich. 305, 236 N. W. 792, 77 A.L.R. 807, 812. In *De Haro v. United States*, 5 Wall. 599, 627, 18 L. Ed. 681, 688, Justice Davis spoke of the incidents of a license as follows: 'It is an authority to do a lawful act, which, without it, would be unlawful, and while it remains unrevoked is a justification for the acts which it authorizes to be done. It ceases with the death of either party, and cannot be transferred or alienated by the licensee,

because it is a personal matter, and is limited to the original parties to it.'

\* \* \*

"The record in this case indicates that the Hittles used the private road for more than twenty years in pursuance of a license, and therefore did not acquire a prescriptive right."

The Court of Appeals in *Dalton v. Real Estate & Improvement Co., supra,* after finding that the evidence in that case showed exclusive and uninterrupted use of the disputed road for twenty years, said, at 43:

"This being so, it will be presumed that the use has been adverse under a claim of right, unless it is proven that the use originated by permission and there has been no change since; the burden of showing that the use was by license or permission inconsistent with the claim of right is upon the owner of the land across which the way runs. *Cox v. Forrest, supra; Wilson v. Waters,* 192 Md. 221, 64 A. 2d 135."

The Court further observed, at 49, that, "Prescription has its birth and fruition in use without permission." This is merely a restatement of the rule expressed by the Court in *Cox v. Forrest, supra,* when it said, at 79, "\* \* \* an adverse right of an easement cannot grow out of a mere permissive enjoyment \* \* \*."

We said in *Zehner v. Fink, supra,* citing and quoting from *Wilson v. Waters, supra,* that the burden is on the landowner to rebut a presumption of adverse use by showing, "\* \* \* that the use of the way was by license inconsistent with a claim of right." We said further, at 344:

"The owner of the land across which the way runs (servient tenement) in order to rebut the presumption of adverse user must prove by affirmative evidence that the way was used with permission or license."

The nature of the legal document which Mr. Richards received from the Zimmermans in 1954, after he had given them permission to use a part of his driveway, is not further explained but it seems reasonable to infer that it constituted a request for either a formal grant or for written permission.

When, by asking for permission, a person using the land of another recognizes the right of the owner to stop the use, then its character ceases to be adverse. 4 Tiffany, *The Law of Real Property*, § 1204 (3d ed. B. Jones 1939). See Note, "Elements of an Adverse User Sufficient to Start the Statute of Limitations Running — Prescriptive Easement", 10 Md. L. Rev. 272, 274 (1949), where it is said that to be adverse the user must be inconsistent with the rights of the landowner and must not be accompanied by any express or implied recognition of his right to put a stop to it.

### 6. There Was No Easement By Prescription

Appellees say that the Zimmermans did not acquire an easement by prescription because, (a) the Zimmermans may not rely upon a use that preceded their title, in 1954, (b) the continuity of the use, whenever it began, was broken in 1958 and 1959 when the Zimmermans lived elsewhere, and (c) the use was permissive in 1954 and thereafter for two years or more, and could not have been continuous for 20 years.

We have shown that the cases recognize that an adverse use for the prescriptive period may be partly before and partly after the acquisition of record title, or may be partly by the present owners and partly by predecessors in privity. The cases show also that a use may be considered continuous under certain circumstances, even though it is occasional or intermittent.

But there can be no doubt that adverse use and permissive use are mutually exclusive. One cannot exist along with the other. The permission which the chancellor properly found was given by Mr. Richards in 1954, less than 20 years before this suit, made a prescriptive easement in this case impossible.

The chancellor found that the Zimmermans had not established a legal right to use any part of the land of the Summerses. Under the facts and the applicable law, any other finding would have been erroneous.

## C. Way of Necessity

The appellants attempt to bolster their position by pointing out that there was no other access to their property from public roads, except by crossing the corner of the Richards property. The argument suggests that the Zimmermans should be entitled to a way of necessity, but this is not a case which requires consideration of the law dealing with that legal principle. The property of the Zimmermans was separated as a landlocked parcel by the 1954 deed which conveyed it to them. Before that severance, it was a part of a larger tract of land which had frontage on a public road. The Court of Appeals said in *Condry v. Laurie, supra,* at 321:

> "It is universally accepted that where a person conveys to another a parcel of land surrounded by other land, and there is no access to the land thus conveyed except over the grantor's land, the grantor gives to the grantee by implication a right of way over his own land to the land conveyed by him."

An earlier expression, more precisely apposite to the facts here, is found in *Fox v. Paul,* 158 Md. 379, 148 A. 809 (1930), where the Court said, at 386:

> "A right to a way of necessity over the lands of the grantor to a public road or highway exists in favor of the grantee when the land granted to him is wholly surrounded by the land of the grantor, or partly by the land of the grantor and partly by the land of a stranger, if there is no other way or outlet from the grantee's land to a public highway. This right, in such case, does not arise from an express grant, but from a presumption that it was the

intention of the parties that the grantee should have access to his lands over the lands of the grantor."

In *Oliver v. Hook,* 47 Md. 301 (1877), the Court said, at 310:

"And a right of way of necessity can only be raised out of the land granted or reserved by the grantor, and never out of the land of a stranger."

The land of Richards was the land of a stranger, as far as the Zimmermans' property was concerned. If a way out of the Zimmermans' property was necessary, it had to be over the retained property of their grantor.

### D. The Law of Equitable Estoppel

#### 1. In General

In support of their claim of estoppel, the appellants make these arguments in their brief.

"Appellants clearly relied on Mr. Richards' granting them a license to cross the corner of his property when bringing materials to build their house. The Appellants relied on the license in good faith because (1) they were on friendly terms with Mr. Richards and (2) a small area over the corner of Appellees' lot did not affect Mr. Richards' enjoyment of his land. The Appellants could, in good faith, rely on having continued access to their lot over the corner of Appellees' lot."

\* \* \*

"The Appellants, in good faith, relied upon the license, voluntarily granted by Mr. Richards, in such a way that they will be seriously injured if the Appellees are allowed to obtain equitable remedies against them. The Appellants do not argue against Mr. Richards' right to revoke his license, but rather urge the doctrine of equitable estoppel prevents the

successors in title to Mr. Richards from seeking
equitable remedies against the Appellants."

They further argue that Mr. and Mrs. Summers were
familiar with the Richards property before they acquired it,
and knew that the Zimmermans were crossing a corner of
the Richards property to reach their home. They argue that
the Summerses were thus on notice of the rights of the
Zimmermans, which they say were, at the least, the right to
raise the defense of equitable estoppel against any attempt
to enjoin their continued use of the Richards property.

In *Cityco Realty Co. v. Slaysman*, 160 Md. 357, 153 A. 278
(1931), a developer in Baltimore County had proposed to the
owners of two lots, each fronting 50 feet on an existing street
and having a depth of 200 feet, that he would open a new
street adjoining the side line of one of the lots, thus giving
the owners 200 feet of frontage on the new street, provided
they contributed to the cost of the improvement. The owners
declined to contribute. The developer opened the street, 49
feet wide, title to which was thereafter conveyed to the
County, but the developer retained title to a one foot strip of
land between the new street and the side line of the lot. The
owners of the lot built a house on the rear of it, facing on the
new street, and began to trespass on the one foot strip in
going to and from the street.

The developer filed a bill of complaint to enjoin the
trespass. The Circuit Court dismissed the bill. The developer
appealed, and the Court of Appeals reversed. The Court said,
at 363-64:

"Before one is justified in expending money in
the improvement of his own land in reliance upon
some supposed right to use the land of another, it is
incumbent upon him first to ascertain that in fact
he does have such a right. For, unless the owner of
the land claimed to be subject thereto has granted
the right by deed, or has by acts *in pais* estopped
himself from denying its existence, no such right
will be implied. Nor will the fact that the
improvement will be useless unless such right

exists be in itself sufficient reason for depriving the owner of the land against which such right is asserted of his property. It has long been settled that 'one who stands by and sees another laying out money upon property to which he has some claim or title, and does not give notice of it, cannot afterwards, in good conscience, set up such claim or title.' *Browne v. M. E. Church,* 37 Md. 124; *Tongue v. Nutwell,* 17 Md. 212; *Carmine v. Bowen,* 104 Md. 203 *et seq.,* 64 A. 932. But that principal has no application where means of knowledge of the true state of the title is equally available to both parties *(Browne v. M. E. Church, supra; Tongue v. Nutwell, supra; Schaidt v. Blaul,* 66 Md. 141, 6 A. 669; *Park Ass'n. v. Shartzer,* 83 Md. 10, 34 A. 536); and 'where the act of one is an encroachment on the soil or rights of another, an acknowledged tort, equally well known or equally open to the notice of both parties, it gives no right until it has continued for such length of time' as to ripen into a title by adverse possession. *Tongue v. Nutwell, supra.* Fraud, actual or constructive, in some form, is an essential ingredient of the doctrine of equitable estoppel (10 *R. C. L.* 688, 21 C. J. 1122), and may take the form of actual misrepresentation by word or act, or silence, when some duty or obligation bids one speak. *Id.;* 21 C. J. 1119, 1161; 10 *R. C. L.* 692. But 'mere silence will not work an estoppel' (10 *R. C. L.* 692), and the principle does not apply where one stands by and sees another laying out money upon property to which he has some claim or title without giving notice of it, where the structure or other improvement is a mere encroachment on land the title to which is equally open to both parties. *Casey v. Inloes,* 1 Gill, 430; *Schaidt v. Blaul, supra. A fortiori* it does not apply to a case where the person charged with the estoppel was not only under no obligation or duty to speak, but where he had no interest whatever in the land upon which the person claiming the estoppel

had made expenditures, and where any protest on his part against such expenditures would have been an officious and futile interference with the right of the improver to do with his own property as he would."

One of the cases relied upon by appellants in their brief is *Greenwalt v. McCardell,* 178 Md. 132, 12 A. 2d 522 (1940). Greenwalt had expended money improving a road which, by express grant, he had a right to use. McCardell also had a right to use the road, by express grant from their common grantor. Greenwalt thought the road was on McCardell's side of their common boundary line. The improvement involved some minor relocation. Greenwalt later discovered that part of the road, as relocated, was on his own property. He then sought to enjoin McCardell's use of the road on the theory that McCardell's silence estopped him from asserting his right. The Court said, at 138:

"It has long been a familiar principle that when one stands by and sees another making expenditures for improvements to property to which he has some claim or title, and does not give any notice or objection, he cannot afterwards in good conscience assert his own claim or title against the improver. But mere silence or acquiescence or failure to object does not operate as an estoppel against one who permitted the making of the improvements in ignorance of his own rights in the property, or in favor of the one making the improvements, when the means of knowledge of the true state of the title is equally available to both parties. The doctrine of estoppel cannot be invoked against a party who was not under any obligation to speak, and when any protest on his part against expenditures for improving the land would have been an officious interference with the right of the owner to improve the property as he saw fit. *Cityco Realty Co. v. Slaysman,* 160 Md. 357, 363, 153 A. 278; 19 *Am. Jur., Estoppel,* sec. 133."

An extensive discussion of the law of estoppel appears in
*Bayshore Industries, Inc. v. Ziats*, 232 Md. 167, 192 A. 2d 487
(1963), also cited and relied on by appellants. This was a
workman's compensation case involving an estoppel against
the employer to raise the defense that the claim was filed too
late, based upon inducement to the employee by the
employer not to file a claim.

The Court of Appeals observed, at 175, that it had
repeatedly approved Pomeroy's definition of equitable
estoppel, 3 Pomeroy's *Equity Jurisprudence* (5th Ed.), § 804,
p. 189, which the Court then quoted as follows:

> " 'Equitable estoppel is the effect of the
> voluntary conduct of a party whereby he is
> absolutely precluded, both at law and in equity,
> from asserting rights which might perhaps have
> otherwise existed, either of property, of contract, or
> of remedy, as against another person, who has in
> good faith relied upon such conduct, and has been
> led thereby to change his position for the worse,
> and who on his part acquires some corresponding
> right, either of property, of contract, or of
> remedy.' "

The Court further said, at 176:

> "Citing the above section of *Pomeroy* and other
> authorities, this Court said in *Rody v. Doyle*, 181
> Md. 195. at 200-201, 29 A. 2d 290: 'An equitable
> estoppel operates to prevent "a party from
> asserting his rights under a general technical rule
> of law, when he has so conducted himself that it
> would be contrary to equity and good conscience for
> him to allege and prove the truth." ' This statement
> is repeated in *Wright v. Wagner*, 182 Md. 483, at
> 492, 34 A. 2d 441. See also *Maryland Casualty Co. v.
> Gates*, 290 F. 65, cert. denied 263 U. S. 708. In *Price
> v. Adalman*, 183 Md. 320, at 325-26, 37 A. 2d 877 (a
> contract case), this Court stated broadly that
> '[w]hen a party voluntarily so conducts himself
> that another party in good faith relies upon his

conduct, and is thereby put in a worse position, then the first party is estopped from asserting rights which might otherwise exist to keep the second party from his remedy.'

"Among the cases cited in *Price v. Adalman*, *supra*, are *Rodgers v. John*, 131 Md. 455, 102 A. 549; *Pearre v. Grossnickle*, 139 Md. 1, 114 A. 725; *Benson v. Borden*, 174 Md. 202, 198 A. 419. In each of these the rule was recognized that whether the doctrine of equitable estoppel should or should not be applied depends upon the facts and circumstances of each particular case, and unless the party against whom the doctrine has been invoked has been guilty of some unconscientious, inequitable, or fraudulent act of commission or omission, upon which another has relied and been misled to his injury, the doctrine will not be applied."

The rather narrow scope of the factual basis required for estoppel was expressed in *Oberheim v. Reeside*, 116 Md. 265, 81 A. 590 (1911), where the Court said, at 276-77:

"It is a well settled principle that mere silence as to rights of record does not create an estoppel. *Frazee v. Frazee*, 79 Md. 30. In *Schaidt v. Blaul*, [66 Md. 141, 6 A. 669 (1886)] an alley was obstructed by the erection of massive stone wall, and a stable, the former having been finished and the latter being in course of construction when the owner of an easement in the alley applied for an injunction. The defense was interposed, among others, that the plaintiff with full knowledge that the work was in progress and that large sums of money were being expended upon it by the defendant, made no complaint of any kind until it was completed. It was contended that by this course of conduct the plaintiff was estopped to allege that his rights had been violated. In overruling this contention, and affirming the decree below requiring the removal of the wall and stable, the Court quoted from *Casey v.*

*Inloes,* 1 Gill 502, as follows: 'The doctrine that where one stands by and sees another laying out money on property, to which he himself has some claim or title, and does not give notice of it, he can not afterwards, in equity and good conscience, set up such claim or title, does not apply to an act of encroachment on land, the title to which is equally well known, or equally open to the notice of both parties; but the principle applies only against one who claims under some trust, lien or other right, not equally open and apparent to the parties and in favor of one who would be misled or deceived by such want of notice.' "

And as late as *Mayor & City Council of Baltimore v. Chesapeake,* 233 Md. 559, 197 A. 2d 821 (1964), the Court observed, at 578, "the appellees' acts were based on knowledge of the facts and the law equal to or greater than those of the City, so that there is not room for the doctrine of equitable estoppel".

Almost contemporaneously, however, the Court in two cases decided in the same week recognized that a broader view of the rule had been expressed in a number of recent cases. In *Travelers v. Nationwide,* 244 Md. 401, 224 A. 2d 285 (1966), written for the Court by Judge Oppenheimer, and in *Bean v. Steuart Petroleum,* 244 Md. 459, 224 A. 2d 295 (1966), written for the Court by Judge Finan, the Court said that estoppel may be applied even in the absence of any fraud or wrongful intent in the actions or the inaction of the party estopped.

In *Travelers* the Court said, at 414-15:

"We have repeatedly stated that whether or not an estoppel exists is a question of fact to be determined in each case. *Gould v. Transamerican Associates,* [224 Md. 285, 167 A. 2d 905 (1961)], at 224 Md. 297; *Liberty Mut. Ins. Co. v. American Auto Ins. Co.,* 220 Md. 497, 501, 154 A. 2d 826 (1959); and cases therein cited. Wrongful or unconscientious conduct on which the other party

relies, to his detriment, is generally an element of estoppel in the particular circumstances, see *Liberty Mut. Ins. Co. v. American Auto. Ins. Co.,* 220 Md. at 500, but an estoppel may arise even when there is no intent to mislead, if the acts of one party cause a prejudicial change in the conduct of the other. *Harrison v. McCarty,* 178 Md. 377, 13 A. 2d 544 (1940); *Benson v. Borden,* [174 Md. 202, 198 A. 419 (1938)]. The rationale of the doctrine of equitable estoppel was given by Judge Prescott (later Chief Judge), for the Court, in *Johnson Lumber Co. v. Magruder,* 218 Md. 440, 447-48, 147 A. 2d 208 (1958), as follows:

'The whole doctrine of equitable estoppel is a creature of equity and governed by equitable principles. It was educed to prevent the unconscientious and inequitable assertion of rights or enforcement of claims which might have existed or been enforceable, had not the conduct of a party, including his spoken and written words, his positive acts and his silence or negative omission to do anything, rendered it inequitable and unconscionable to allow the rights or claims to be asserted or enforced.'

See also *Solomon's Marina v. Rogers,* 221 Md. 194, 198, 156 A. 2d 432 (1959); *Maryland City Realty v. Vogts,* [238 Md. 290, 208 A. 2d 701 (1965)], and *Savonis v. Burke,* 241 Md. 316, 319-20, 216 A. 2d 521 (1966). The statements in the later cases emphasize that it is the effect of the conduct of a party, apart from its morality, upon the position of the other party, which is the basis of equitable estoppel."

\* \* \*

"In *Harrison,* the Court held that an employer, by his conduct, was estopped to raise a defense that a claim under the Workmen's Compensation Act was

not filed within a year, as provided by the statute. In citing *Harrison* in *Bayshore Industries, Inc. v. Ziats,* 232 Md. 167, 179, 192 A. 2d 487 (1963), Chief Judge Brune, for the Court, said: '*Harrison v. McCarty, supra,* did not present any wilful or deliberate unconscientious or inequitable conduct on the part of the employer, and, indeed, we think that it presented no inequitable conduct at all.' "

In *Bean v. Steuart Petroleum* the Court said, at 465-66:

"The older cases followed the doctrine of estoppel as it is set forth in *Cityco Realty Co. v. Slaysman,* [citation and quotation omitted] * * *.

"It would appear that this Court relaxed its view that mere silence is insufficient to create an estoppel and that other misleading action coupled with the silence on the part of the party to be estopped is needed in order to find estoppel *in pais,* in the case of *Bradley v. Cornwall,* 203 Md. 28, 98 A. 2d 280 (1953)."

The rule, unrelaxed, is stated, with specific application to real property, in 28 Am.Jur.2d *Estoppel & Waiver* § 81 (1966) as follows:

"As a general thing, in order to establish an equitable estoppel against one asserting his title or claim to real property, the party attempting to raise it must show an actual fraudulent representation, concealment, or such conduct or negligence as will amount to a fraud in law, and that the party setting up such estoppel relied thereon, and was actually misled thereby to his injury. If, at the time when he acted, the party claiming the estoppel had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means, he cannot claim to have been misled by relying upon the representation or

concealment. It must be pointed out, moreover, that in all instances a clear, strong case of estoppel must be made out where a clear legal title to land, requiring written conveyance to pass it, is to be divested out of its owners and vested in others as if a conveyance had been made. Furthermore, it has been stated that an estoppel in pais alone is not sufficient to cause equity to compel a transfer of the title to real estate to the one in whose favor it runs, when the value of the land has materially increased since the estoppel accrued, so that payment of its former value, without interest, will involve less injury to those in possession. Of course, a mere trespasser may not estop the owner from asserting his title in a court of law or equity."

But it is plain that the rule now to be followed in Maryland is that equitable estoppel may be applied, not only when the conduct of the party to be estopped has been wrongful or unconscientious, and relied upon by the other party to his detriment, but also when the conduct, apart from its morality, has the effect of rendering it inequitable and unconscionable to allow the rights or claims to be asserted or enforced.

Taking the view of the law of estoppel most favorable to the Zimmermans does not help them in the circumstances of this case. They point to nothing that Richards did, intentionally or innocently, which they relied upon to change their position to their detriment. When they asked his permission to cross his land in connection with the building of their house, he gave it. When they sought a more formal right from Richards, he declined to give it and told the Zimmermans that they should arrange to go out over the property of their grantor. The Zimmermans made no improvement on the Richards land, and he had no duty, nor even a right, to complain about what they did on their own.

The occasional requests by Richards to the Zimmermans that they arrange for a different way in and out of their property would not be sufficient to interrupt the continuity

of a use that was otherwise adverse. On the other hand, the fact that the requests were made in neighborly friendliness rather than as forceful demands would not make the earlier permission irrevocable. Those requests amounted either to a revocation of the previous permission, or at least to an expression of an intent to revoke it. In no way could they mislead the Zimmermans.

Unless the permission be viewed as irrevocable, a point we shall discuss later, it was in fact revoked either by Richards directly, or by his sale of the property to the Summerses. Whatever the manner of revocation, the permission once given did not ripen into an implied grant which Richards and his grantees would be estopped to deny.

## 2. Revocability of License

The rule adopted and applied in Maryland is that an oral license by an owner of land permitting another to use the land of the licensor is absolutely revocable. It is a personal privilege and is usually terminated on the death of either of the parties or by the transfer of ownership of either the land subject to the license or the land for the benefit of which the license was given.

Under certain circumstances, when the license is executed or partly executed, sometimes referred to as a "license acted upon", a court of equity may not enforce the owner's right of revocation without imposing upon him a condition that he compensate the licensee for the value of work done by the licensee on the licensor's property which would be of benefit to the licensor.

In *Brehm v. Richards*, 152 Md. 126, 136 A. 618 (1927), Richards was the owner of a farm to which the only access was over a private road that ran through the farm of Brehm and the farm of another. The road had been used by the owners of all three farms for many years. At one point on Brehm's farm, the road forded a small stream. Brehm constructed a bridge or culvert over the stream at a different location, and the location of the road was changed, apparently by common consent and without discussion, so as

to cross the stream over the new culvert. Richards, by providing a substantial amount of labor and material, improved the new roadway from the culvert crossing in the direction of his farm. Brehm was aware of the work but it appears that nothing was said by either party to the other. Some time later, Brehm erected a fence to block the road at a point below the stream, thus preventing Richards from using the culvert and the new road for access to his own farm. Richards sued to require that the obstruction be removed. The Court of Appeals held that to the extent that Richards was a licensee, the license was revocable. The Court said, at 132:

"It is well settled that a right of way over land is an interest in the land which cannot (apart from prescriptive user and necessity) be created except in the mode and manner prescribed by the recording statutes. *Hays v. Richardson*, 1 G. & J. 366; *Baltimore and Hanover R. Co. v. Algire*, 63 Md. 319, 320. 'A permanent interest in land cannot be acquired by a mere license, and a right of way being an interest in land, it is equally well settled that such an interest cannot be acquired at law in this state, except in the mode provided by the statute, that is, by deed executed and recorded.' *Baltimore and Hanover R. Co. v. Algire, supra,* page 323. And a mere license is from its nature revocable at the will of the licensor, at least when the license is for the use of the licensor's land. In *Addison v. Hack*, 2 Gill, 221, 226, this Court followed the distinction, widely adopted elsewhere, between a license to use the licensor's land and a license to make some use of the licensee's own land which affects the licensor; if the licensee has acted upon the license to make the use of his own land, that license is held not revocable, but a license to use the land of the licensor is always revocable at law, because irrevocability would mean a conveyance of a permanent interest in the land in violation of the statutes. In this state, what has been termed

execution of the license, that is to say, the expenditure of any labor or expense in reliance upon it, does not give a permanent, irrevocable right in the use of the land."

The Court summarized, at 135:

"The rule adopted in this state, then, both at law and in equity, is that a license for a use of land and structures of a landowner is revocable, whether that license is or is not executed by the expenditure of money by the licensee. The principle of equitable estoppel cannot be resorted to for prevention of revocation."

It may be noted that in *Brehm v. Richards, supra,* the Court of Appeals, after reversing the decree below which had granted an injunction against the obstruction, remanded the case and directed the lower court to award Richards reasonable compensation for the construction work on those portions of the road which Richards could no longer use but which would be beneficial to Brehm.

In *Mayor & City Council of Baltimore v. Brack,* 175 Md. 615, 3 A. 2d 471 (1939), the successor owner of land under which the City of Baltimore had installed water and sewer lines pursuant to an oral license, obtained a mandatory injunction against the City requiring that it remove the lines installed in his property. The Court said, at 622:

"A brief summary of the cited cases, therefore, leads to the conclusion that unrecorded grants of easements in land must give way to a grant of the fee, and that apart from a prescriptive right, an easement is an interest in land which cannot be created except in the mode and manner prescribed by the recording statutes of this state; that a license for the use of land is revocable, both at law and in equity, whether the license is or is not executed by the expenditure of money by the licensee; and that the latter, upon the revocation of the license, can claim compensation for expenditures made by him

upon the premises on the faith of the license, as against the original licensor only."

In the exercise of its equity jurisdiction, the Court required that the issuance of the injunction be delayed for sufficient length of time to enable the City to attempt to acquire the necessary easements for its lines by negotiation or by condemnation, or to decide to remove or relocate the lines.

In the case before us, there is no basis upon which the license or permission given by Richards to the Zimmermans could be held to be irrevocable, nor is there any benefit to the Summerses from improvements made by the Zimmermans for which, in equity, compensation ought to be paid.

The starting point in this case is that the Zimmermans, appellants here, have been using the property of the Summerses, appellees here, for ingress to and egress from their adjoining property. The Zimmermans have shown no express grant of a right to such use, nor have they shown that there has been adverse use for the prescriptive period of twenty years, so that a grant would be implied. Neither do the facts call for application of the doctrine of equitable estoppel to prevent the Summerses from complaining of the trespass.

The chancellor correctly concluded that the Zimmermans were trespassers on the Summers property, and his decree enjoining that trespass must be affirmed.

*Decree affirmed.*
*Appellants to pay costs.*